WICKER, Judge,
concurring in part and dissenting in part:
This appeal arises from a worker’s compensation claim filed on behalf of Larry Joe Virgil (Virgil), plaintiff/appellee, against the employer, Scaffolding Rental & Erection Service, Inc. (Scaffolding) and the employer’s insurer, American Guarantee & Liability Co. (American) seeking benefits for a work-related accident occurring on December 7, 1982.
On March 27, 1986 the trial judge granted judgment in favor of Virgil and against the defendants in the amount of 100 weeks of compensation at the rate of $153.00 per week, subject to a credit for the compensation previously paid. From this adverse judgment only the insurer, American, has appealed.
On March 7, 1986 the matter was heard. At trial, the only witnesses to testify were Virgil and his mother, Jesse D. Virgil. Counsel stipulated to various medical records, medical reports and physicians’ depositions.
Additional stipulations were as follows: There was an accident; Virgil received $153.00 per week in compensation from December 7, 1982 (the date of the accident) through May 19, 1983 and all of Virgil’s medical bills had been paid.
Appellant American now specifies the following as error:
That the trial court erred in awarding Virgil a judgment for 100 weeks compensation at a weekly rate of $153.00 per week against American, less any compensation benefits already paid the plaintiff.
In addition, appellee, Virgil has answered the appeal and seeks to have the judgment modified[1] as follows:
to award appellee benefits of total and permanent disability, or alternatively, to award appellee benefits of total and permanent disability or alternatively, to award appellee temporary total disability, until such time as the trial court determines that he is able to return to his former employment, with all past due benefits brought up to date.
On January 12, 1987, this court rendered its opinion denying Virgil’s worker’s compensation claim beyond the period for which it was stipulated that he was paid compensation. The period began on the date of the injury and continued until his discharge to return to work by Dr. V.T. Zeringue. The opinion was based upon a two-fold standard of review; namely, the manifest error rule as applied to the live testimony of Virgil and his mother, See Canter v. Koehring, 283 So.2d 716 (La.1973) and the sufficiency and preponderance of the evidence test with regard to the *1239 medical reports, records, and depositions. See Dickerson v. Zurich American Insurance Company, 479 So.2d 571 (La.App. 1st Cir.1985); Woodard v. George Cole Chevrolet, Inc., 444 So.2d 1367 (La.App. 2nd Cir.1984) and Duckworth v. Winn Dixie Louisiana, Inc., 490 So.2d 408 (La.App. 5th Cir.1986), writ denied 495 So.2d 303 (La. 1986).
Writs were granted in this matter[2] by the Louisiana Supreme Court. Virgil v. American Guarantee and Liability Insurance Company, et al., 507 So.2d 825 (La.1987) (per curiam).
The Louisiana Supreme Court set aside this court’s prior judgment, and remanded the case for a review of the record under the manifest error rule. See Canter, supra.
The majority opinion seems to have analyzed LSA-R.S. 23:1221(4)(p)[3] in a similar fashion as the other portions of the worker’s compensation statute which require a finding of disability. This provision is an anomaly and is a “catch all” provision. As explained in the Malone and Johnson Treatise 13 W.S. MALONE & H.A. JOHNSON WORKERS COMPENSATION LAW AND PRACTICE, Section 286 (1980):
[LSA-R.S. 23:1221(4)(p) ] is an unusual provision ... It could be regarded as akin to a tort award within the Act, in an amount in the discretion of the court up to the specified maximum. The “permanent impairment” language ... has come to be the more important of the two bases of recovery and serves as a catchall when the employee appears to be injured, but is neither disabled nor suffers from an injury to some member mentioned in the schedule of specific losses.
This sub-section is difficult to square with the compensation principle, since it is not based upon loss of earning capacity even though no fault of the employer need be shown. MALONE & JOHNSON at 664. [Emphasis supplied]
Malone and Johnson’s interpretation of LSA-R.S. 23:1221(4)(p) is supported by the Louisiana Supreme Court’s analysis of the original (and similar) version of that section in Garr v. Wyatt Lumber Co., 147 La. 689, 85 So. 640, 641 (1920) as well as the more recent case of Ventress v. Danel-Ryder, Inc., 225 So.2d 765 (La.App. 3rd Cir.1969) and the cases cited therein.
Most importantly, the Louisiana Supreme Court in a 1986 opinion has cited the analysis used in Ventress, supra, with favor in footnote 4 of its opinion in Mott v. Wal-Mart Stores, Inc., 486 So.2d 112 (La.1986) as follows:
Ventress, surpa is inapposite to the case at bar. While it is true that the court in Ventress allowed an award for impairment of physical function under section 1221(4)(p) for a claimant who had a ten percent (10%) permanent impairment of the back (a situation not unlike the quantification[4] of Mott’s disability by Dr. Walker), the facts in Ventress, supra, indicate that the impairment was not severe enough to handicap the plaintiff in gaining employment nor to prevent him from performing his duties at his former job. Based on these facts, the Ventress court was correct in finding section 1221(3) inapplicable; therefore, the only appropriate remedy for the plaintiff was section 1221(4)(p). Mott, *1240 supra, n. 4 [486 So.2d] at 114. [Emphasis supplied]. (Footnote added).
The majority opinion further seems to be making a factual determination from its review of the record, rather than considering the evidence in light of the manifest error standard mandated by the Supreme Court’s per curiam. Virgil, supra; see also, Canter, supra; Arceneaux, supra. This writer believes that the trial judge’s evaluation of credibility of the witnesses considered together with all of the evidence fails to disclose manifest error and that the trier of fact’s conclusions should not be disturbed on appeal.
At trial the only witnesses to testify were Virgil and his mother. Virgil, who was 28 years old at the time of trial, testified that on December 7, 1982, he was employed by Scaffolding when he was injured while he was engaged in pulling stock and stacking boards. As he lifted an approximately 16-foot board, he hurt his back and could not stand erect. He never had back trouble before this incident.
He had been employed by Scaffolding for approximately nine months prior to the accident. He earned $5.50 per hour for a forty-hour week at the time of the accident. After receiving medical care, he returned to work the following day but found that he was unable to perform any tasks. He has not returned to Scaffolding since that date.
Shortly thereafter, he was hospitalized and placed in traction for approximately four days. He saw various physicians who prescribed conservative treatment for his pain; however, he continues to suffer from pain in his back.
On the date of trial he was wearing a brace as prescribed by one of his treating physicians. He wears the brace every three days or so. He noted that although his back hurt him the day before trial, it was not hurting on the trial date. His back hurts him approximately every other day and causes pain even if he remains inactive.
He described the pain as intermittent pain which radiates down his left leg. Furthermore, whenever he bends his back hurts.
He stated that he sought treatment at Charity Hospital two weeks ago (prior to trial), and was told to return for therapy.
He testified that he was re-hospitalized for approximately seven days at Charity Hospital during the year prior to trial when he underwent tests on his back.
He admitted that approximately three months before the trial he worked with someone wiping tiles around a swimming pool over a three-day period. This is the only work he has attempted since he stopped working at Scaffolding. His reason for not seeking out work is due to the pain he experiences.
Virgil lives with his parents and is not receiving unemployment compensation. At home he cuts the grass every two weeks although he has to do this task slowly. Most of the time his day is spent looking at television.
Although he had an automobile accident subsequent to the accident at work, he denied hurting his back. Instead, he stated that he hit his neck and head. He also denied telling Dr. Juneau that he had injured his back in this second accident.
Virgil’s mother, Mrs. Jesse Virgil, corroborated his testimony regarding pain. She stated that Virgil has not returned to employment because he complains of back pain. He takes medicine, including aspirin which she administers for the pain. His complaints of back and leg pain have been constant since the work accident. He wears his back brace as well.
Although he had an automobile accident after the work accident, she denied that he had injuries from the second accident.
Although the trial judge gave no reasons for judgment he did make findings of fact when he denied the appellant’s motion for a new trial. On May 2, 1986 the following colloquy is noted in the record establishing that the trial judge determined Virgil’s testimony to be credible:
THE COURT:
I think this man continued to suffer based upon the accident and the treatment given by these doctors, even as I *1241 reviewed the medicals, I was convinced that this man did suffer a period of one hundred weeks. Even from his own testimony and even from my own observation of this man, I was convinced that this man, under the circumstances of this accident, was entitled to one hundred weeks of compensation. I believe this man suffered pain and I think this man was unable to go back to work for any protracted period of time. He tried to do certain things during the course of this period of time like you said. He went to do some work. I am convinced and I think his mother also testified, didn’t she, relative or a relative or something?
MR. GAUDRY:
I don’t recall, Your Honor.
THE COURT:
I’m convinced that under the circumstances of this case, this young man was entitled to one hundred weeks. Okay, and based upon that, Mr. Gaudry, I’m going to deny your motion for a new trial.
In the instant case, either Virgil was truly suffering from pain which seriously permanently impaired the usefulness of a physical function so as to fall within the scope of LSA-R.S. 23:1221(4)(p) or he was fabricating his complaints. The trial judge believed Virgil and did not find that he was fabricating the complained-of-pain. This court should not disturb that finding of credibility by the trial judge unless it is manifestly erroneous. There is ample documentation in the record that Virgil complained of pain to all of the physicians he saw; however, there is a conflict in testimony regarding the interpretation of that pain. The relevant medical testimony, reports, records and depositions are set out as follows:
On the date of the work accident, Virgil was seen by Dr. Earl Alleman who diagnosed him as having an acute strain of lumbar muscles. On that date he took x-rays of the LS vertebra which he considered as negative. He was seen for three further follow-up visits and was referred to Dr. Zeringue on his last visit of December 20, 1982.
On December 21, 1982, Dr. V.J. Ze-ringue, an orthopedic specialist, first examined Virgil. When he examined him on that date he noted lumbar muscle spasms and diagnosed him as having Lumbosacral strain. He hospitalized Virgil on the same date for pelvic traction and other treatment. He was discharged from the hospital as improved on December 24, 1982.
Since December 24,1982 he was followed by Dr. Zeringue for office visits on February 3rd, March 7th, April 4th and April 28th, 1983. Virgil was also sent for physical therapy by Dr. Zeringue. On April 11, 1983 an EMG study was performed which showed no evidence of nerve or root pathology. The EMG test was performed by Dr. R. Hugh Fleming.
His last visit to Dr. Zeringue was on May 19, 1983. On that date he complained of “intermittent discomfort in the lower back.” Although Dr. Zeringue found no evidence of muscle spasms, restriction of motion, or neurological deficits, he did advise Virgil “that he [would] probably have intermittent discomfort from time to time in the lower back which should be tolerable to a level to allow him to return to work.” [Emphasis supplied]
It was Dr. Zeringue’s opinion on May 19, 1983 that Virgil had reached a maximum benefit from his treatment and that he could return to work.
During the time Virgil was under the care of Dr. Zeringue he also saw Dr. J. Monroe Laborde, another orthopedic specialist, at the request of American. Dr. Laborde saw Virgil on January 24, 1983 and April 22, 1983. In his report dated January 24, 1983, Dr. Laborde related that Virgil complained of low back pain which was always present. Virgil described the pain as increasing while he was bending and decreasing while in a lying position. Occasionally he had left leg pain. On examination on that date, Dr. Laborde noted tenderness (it looks like he also noted muscle spasm as well; however, the copy of his report filed as an exhibit is not readable in part).
*1242 Dr. Laborde took x-rays on that date and found them to be within normal limits. On that date he stated that his impression was that Virgil had lumbar myositis by history and that there was no contraindication for him to return to work. He felt that Virgil would “recover completely with time.”
In a second report dated April 22, 1983, Dr. Laborde indicated that Virgil's “main problem is low back pain and [that] he has occasional mild pain in the left leg and numbness but no weakness or incontinence.” On that date, he demonstrated no muscle spasm or tenderness. His x-rays, however, showed “a thoracolumbar scoliosis from T9 to L2 of approximately 20 degrees.” With the soliosis in mind, Dr. La-borde’s second opinion was as follows: “[i]t is my impression that this patient has low back pain by history superimposed on preexisting scoliosis. He has no objective physical impairment. I recommended that he take an anti-inflammatory agent and use a Back Owner’s Manual for exercises. He was given a prescription for Naprosyn and advised to return for a trial of work April 25, 1983.”
Evidently relying on Dr. Zeringue’s opinion that Virgil could return to work on May 19, 1983, American ceased payment of worker’s compensation on that date. However, Virgil was re-hospitalized at Charity Hospital approximately four months later on September 27, 1983.
Dr. William D. Jameson, an orthopedic resident at the time of Virgil’s admission to Charity, testified by way of deposition. At his deposition taken December 14, 1983 he testified as follows:
Virgil first sought treatment at Charity on July 25, 1983 when he was seen by Dr. Collins, an orthopedic intern. The history taken by Dr. Collins indicated that Virgil stated that he had chronic low back pain since the date of the accident. Virgil also related to Dr. Collins that there was radiating pain down his left leg. The pain increased with coughing, sneezing, sitting and walking too long. He stated that he had not received relief from the conservative treatment he had previously received.
Although Dr. Collins concluded that the physical examination taken on that date was within normal limits, he did note “some bilateral weakness of the foot muscles ... which [were] symmetrically decreased ... inconsistent variable response to questioning as to sensation to pinprick.” Dr. Collins prescribed Motrin, gave exercises advised Virgil to continue to wear his back brace, and to get frequent bed rest.
At Charity, Virgil was next seen by Dr. Jameson on September 8, 1983. Virgil again related his pain symptoms. Although Dr. Jameson found no evidence of muscle spasm on that date, he did, however, find “palpation of both the sacroiliac joint and midline of the low back revealed some pain. Palpation of the left sacroiliac joint cause[d] some radiating pain into the left leg.”
Dr. Jameson thought that he had prescribed anti-inflammatory medication for Virgil and advised him to get bed rest and when possible to wear his corset. He was admitted into the hospital on September 27, 1983 and a myleogram was performed on September 28, 1983.
During his stay at Charity, he was seen by Dr. Jameson, a radiologist and chief residents.
Dr. Jameson reviewed Virgil’s myleo-gram with his chief resident. The myleo-gram was interpreted as “essentially normal”. Dr. Robertson, the radiologist, noted on the chart that there was “no disk [sic] bulge, central herniation or sleeve involvement. There was some possible evidence of a subarachnoid indentation at the L5-S1 level and the L4-L5 level.” Dr. Jameson explained that the phrase, “essentially normal”, meant that “there wasn’t anything we could do for him surgically.”
Dr. J. Ollie Edmunds, a board certified specialist in orthopedic surgery on the staff at Tulane Medical School, was deposed along with Dr. Jameson in the same session. Dr. Edmunds explained that a pathologist’s handwritten note on the chart may differ from his later-typed report since the second report is often based upon a more scrupulous evaluation. Dr. Edmunds noted that the handwritten report by Dr. *1243 Robertson stated his conclusion that there was “[m]ild central disk [sic] bulging or less likely central disk [sic] herniation at L4-L5 and L5-S1 levels. There is no deformity of the nerve root sleeves.” [Emphasis supplied]
However, Dr. Robertson’s typewritten report stated “[mjoderate concentric disk [sic] bulging without definite spinal canal stenosis at the L4-L5 and L5-S1 disk [sic] levels. There is no definite disk [sic] herniation seen in the present scan.” [Emphasis supplied]
Dr. Jameson related that after the tests Virgil was kept 48 more hours in the hospital for “[t]he fitting of a lumbrosacral corset, which we felt may help his back pain, and he was asked to be strictly followed-up in the clinic in two weeks.”
Dr. Jameson examined Virgil on September 19, 1983. He recalled the history he took on that date as follows: “This was a 26 year old with progressive back pain not helped by conservative means, desires relief of pain even if it requires surgery; no bowel problems but frequency with urination. The feeling at that time was, although not written, the patient was becoming progressively worse.” [Emphasis supplied]
Dr. Jameson last examined Virgil on September 27, 1983. As of the date of the deposition, December 14, 1983, Virgil had not returned to Charity Hospital since his discharge on October 6, 1983. On September 27, 1983 Dr. Jameson recalled that “again this is not documented, and the reason it is not documented is there is no reason to suspect that there would be any change in a chronic problem, but essentially there was no change. I went through a cursory physical examination before discharging him, and there were no changes.” [Emphasis supplied]
Dr. Edmunds corroborated Dr. Jame-son’s opinion that Virgil suffered from a chronic condition when he testified that “this is not an acute condition. For instance, Dr. Laborde sent him back to work months ago, so I am unable to give you any certain date at which he can return to work, since I think he has reached a point of maximum improvement and he has a chronic condition. His complaints may be prolonged, but he has already been sent to work by one orthopedic surgeon.” [Emphasis supplied]
Dr. Edmunds would however recommend “a return-to-work trial.” [Emphasis supplied] Furthermore, he noted that further recommendations regarding his treatment or his ability to work would be made after the trial period.
Since Dr. Edmunds only saw Virgil once while he was at Charity as part of his teaching rounds, he based his opinion on the medical records, the evaluations of Dr. Jameson and his senior residents, the x-rays, myleogram, CAT-scan and EMG. He also saw the reports of Dr. Zeringue and Dr. Laborde. While he disagreed with Dr. Laborde’s finding of scoliosis, he admitted that no x-rays were taken at Charity of the T9 to L2 levels where Dr. Laborde had discovered the condition.
Dr. Edmunds concluded that there was no definite evidence of degenerative disc disease, arthritis or any other diagnostic entity. He did note, however, that “the prognosis was not good from the standpoint of the patient’s subjective complaints, in that they may be prolonged, but that from our findings, from our physical examination findings and our diagnostic findings, we found no evidence of physical impairment.” [Emphasis supplied] Dr. Edmunds, in explaining this conclusion, focused on the distinction between objective versus subjective findings. However, he admitted that when he recommended a “trial” work period, he felt that by returning to work Virgil would forget about his symptoms.
When questioned whether Virgil’s return to work would improve his medical condition or instead be good for his mental health, Dr. Edmunds replied. “I would think the latter is true.”
On December 21, 1983 Dr. Mark Juneau, Jr., a board-certified specialist in orthopedic surgery, was deposed. He examined Virgil on December 7, 1983. On that date Virgil again complained of low back pain with the pain occasionally radiating into the left leg, *1244 the region of the posterior thigh, and the plantar aspect of the foot (or bottom of foot). Most of the pain, however, was reported to be localized in the lower back, left hip, and posterior thigh.
Dr. Juneau noted that Virgil told him that he had been involved in an automobile accident several weeks prior to the examination and that the accident did increase the pain in his lower back (as noted earlier, Virgil denies that he told Dr. Juneau this).
During his physical examination Dr. Juneau noted that Virgil was “able to place [his] hand below [the] level of knees. This created pain in the sacral region. He was found to be tender to palpation over the mid sacrum.” [Emphasis supplied]
Dr. Juneau concluded that there was “[n]o objective evidence of a peripheral nerve injury or a herniated nucleus pulpo-sus, a ruptured disk [sic], and I felt that his complaints were subjective in nature and that they were probably due to just a lumbosacral strain, and I use this term because I found no other way of explaining his back pain.” [Emphasis supplied]
He also concluded that he could find no reason why Virgil could not return to his former employment. He further explained, however, that “The patient’s complaints were related more to the posterior thigh and buttocks region, and this is compatible with an individual who has irritation in the interspinous process, which can go along with an individual who has a strain, like a sprain like in the ligaments of your ankle." [Emphasis supplied]
He found no evidence of scoliosis or of muscle spasm. He did propose treatment of exercises and anti-inflammatory medications, however.
Dr. A.G. Kleinschmidt, Jr., an expert in orthopedic surgery, was appointed by the court to examine Virgil. Dr. Kleinschmidt examined Virgil on June 13, 1984 and reviewed various records. He gave two reports to the court. Evidently in his first report of October 25, 1984 he did not have access to all of the records. On November 5, 1984 he gave his second report after being forwarded copies of the missing information from Virgil’s counsel.
Dr. Kleinschmidt concluded that:
[i]t is my opinion that this patient sustained a soft tissue injury of the lumbar spine as a result of lifting a heavy board while working on December 1, 1982. It is my opinion that this patient sustained a soft tissue injury of the lumbar spine in the nature of a musculoligamentous strain. Injuries of this nature are usually self-limiting and usually resolve themselves with no partial permanent physical impairment.
It is my opinion that this patient had a pre-existing very mild scoliosis to the right through the thoracolumbar spine. This pre-existing condition may have been aggravated by the lifting injury and may be partially responsible for the prolonged period of symptomatology. [Emphasis supplied]
Dr. Kleinschmidt recommended that Virgil return to his former employment. He further found “no positive objective findings to substantiate his complaint of low back pain.” It is unclear from the first report why Dr. Kleinschmidt on one hand explains Virgil’s prolonged symptomatolo-gy by being caused in part by a pre-exist-ing scoliosis and then on the other hand reports that there are no objective findings to substantiate his complaints of pain!
Perhaps his second report sheds some light on those seemingly inconsistent statements when he states that there is no evidence of nerve root involvement, a herniated disc, or disc disease. Since he was not deposed, this court can only assume that the trial judge evidently interpreted the seemingly inconsistent statements to mean that while he diagnosed him as having a strain, he saw no objective evidence of disc disease.
The trial judge could have made that reasonable interpretation since the thrust of his second report is to focus on the lack of evidence of disc disease when he noted that:
[m]ore important than any diagnostic test is the results of the clinical examination. Originally this patient had muscle *1245 spasm in his low back but-never had any neurological deficits of his lower extremities. This was reported by the many physicians treating this patient. It is also my opinion that if this patient had any indication of herniated disc disease at all, he would have had back surgery while at Charity Hospital. The fact that the resident did not deem it necessary to operate on this patient while at Charity Hospital is to me conclusive proof that they did not believe this patient to have disc disease of the lumbar spine.
Finally on March 5, 1985, Dr. Yugi Nu-maguchi, an expert in both radiology and neuroradiology, testified that he reviewed some of the films taken of Virgil. He did not examine Virgil. Based upon his review of some of the films he concluded that Virgil had a “normal lumbar myleogram and normal lumbar CT particularly at the L4 level.” Therefore, Dr. Numaguchi did not have the benefit of all of the data on Virgil.
In summary, while the facts clearly indicate that Virgil demonstrated no evidence of nerve root involvement, a herniated disc or disc disease, there is sufficient evidence to support the trial judge’s obvious conclusion that Virgil suffered a work-related injury in the nature of a chronic lumbo-sacral strain with a poor prognosis for remission. Furthermore, although injuries of this type are usually self-limiting, his is an unusual case since he had the pre-existing condition of scoliosis. It is also of no moment that he was discharged to return to work or a work-trial for the purposes of recovery pursuant to 1221(4)(p).
Additionally, I believe that it is this very type of injury, which does not produce a disability, which is appropriate for LSA-R.S. 23:1221(4)(p). Therefore, I respectfully dissent in part from the majority opinion and believe that the judgment of the trial court should be affirmed.

. Although appellee also seeks costs in the trial court, we note that the trial judge did award him those costs. Appellee further seeks costs in this appeal as well.

. This Court's previous unpublished opinion is Virgil v. American Guarantee and Liability Ins. Co., et al., No. 86-CA-446, slip op. (La.App. 5th Cir. Jan. 12, 1987) (Not Designated For Publication).

. LSA-R.S. 23:1221(4)(p) in effect at the time of Virgil’s accident provided that: In cases not falling within any of the provisions already made where the employee is seriously permanently disfigured about the face or head or where the usefulness of a physical function is seriously permanently impaired, the court may allow such compensation as is reasonable and in proportion to the compensation hereinabove specifically provided in the cases of specific disability, not to exceed sixty-six and two-thirds per centum of wages during one hundred weeks. [Emphasis supplied]

.Although no physician assigned Virgil a percentage of impairment, I believe that the very nature of his injury did not lend itself to such quantification. This man obviously had a chronic problem and a poor prognosis for function free of pain.